# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

A.L. SCHUTZMAN COMPANY, INC.,

               Plaintiff,

    v.                                      Case No. 08-CV-465

NUTSCO, INC.,

               Defendant.

_____

## ORDER

Plaintiff A.L. Schutzman Company, Inc. ("Schutzman") accuses defendant Nutsco, Inc. ("Nutsco") of breaching their contract for the sale and delivery of cashews. Schutzman alleges that Nutsco's failure to deliver all promised loads of nuts forced Schutzman to purchase replacement cashews at a higher market price. Schutzman seeks an award of damages in the amount it paid to obtain cashews from other providers above the price provided for in its contract with Nutsco. Nutsco also makes allegations of its own. Nutsco asserts counterclaims against Schutzman for breach of contract, unjust enrichment, conversion, and breach of duty to act in good faith. Schutzman now seeks summary judgment on its breach of contract claim and on each of Nutsco's counterclaims. Based on the reasoning set forth below, the court will grant Schutzman's motion in its entirety.

## BACKGROUND

Schutzman is a Wisconsin corporation engaged in the business of selling roasted and salted nuts. (Defendant's Response to Plaintiff's Proposed Findings of

Fact, hereinafter "DRPFOF," ¶ 1). Nutsco is a New Jersey wholesaler of cashews that imports the nuts from an affiliated Brazilian company and then packs and sells them in the United States. (Id. at ¶¶ 2-3; Plaintiff's Responses to Defendant's Additional Proposed Findings of Fact, hereinafter "PRDFOF," ¶ 128). The Brazilian supplier is owned and controlled by Francisco Assis Neto, who resides in Brazil. (Id. at ¶¶ 4-5). Neto's son, Patricio Assis, lives in the United States and manages Nutsco's operations. (Id. at ¶ 6).

In 2006, Nutsco began using the services of food broker Jim Warner and his company, J. Warner, Inc. (collectively, "Warner"), for facilitating the sale of its cashews. (DRPFOF ¶¶ 8-9). Warner was authorized to talk to customers, to quote prices and agree to delivery dates, and to enter into particular contracts with customers on Nutsco's behalf. (Id. at ¶ 11). Indeed, nearly all of Nutsco's communications with Schutzman were conducted through Warner, and Nutsco sales invoices listed Jim Warner as its "salesperson." (Id. at ¶¶ 11, 12). While serving in this capacity, Warner brokered a contract between Nutsco and Schutzman whereby Nutsco promised to deliver twelve 35,000 pound loads of super large, whole, first quality ("SLW-1") cashews. (Id. at ¶ 14). The contract also included an option allowing Schutzman to buy four loads of large, whole, first quality ("LW-1") cashews, if exercised by a certain date. (Id. at ¶ 15; PRDFOF ¶ 131).

After brokering the contract between Nutsco and Schutzman, Warner sent a written Contract Confirmation to both parties. (DRPFOF ¶ 22). The contract

-2-

confirmed shipment of 12 loads of SLW-1 cashews to be delivered at various intervals between February and September 2007, and confirmed that loads delivered prior to July 1, 2007 would be $3.30/lb. and loads delivered after July 1, 2007, would increase by three cents per month. (Id. at ¶¶ 23, 24). The Contract Confirmation specified that payment terms were "net 30 days," but did not provide that interest or late charges would be owed for late payments. (Id. at ¶ 25).

Though the original contract provided for only 12 loads of SLW-1 cashews, Schutzman later sought to increase that number. Warner amended the contract to add two additional loads. (DRPFOF ¶ 32). Patricio Assis is "not sure" whether he authorized Warner to add these two loads. (Id. at ¶ 33). However, at the time, in March 2007, Warner sent a copy of the revised Contract Confirmation adding the two extra loads (loads 13 and 14) to both Nutsco and Schutzman. (Id. at ¶¶ 34, 39). The revised version noted that "two loads were added on 3/2/07, one more for Sept shipment and one for October," and included a schedule for delivery of 14 loads between February and October 2007. (Id. at ¶¶ 35-36). The new Contract Confirmation increased the "net weight" of cashews for sale and delivery by 70,000 pounds and increased the "quantity" of "50 lb. bags" by 1400 from the original contract. (Id. at ¶¶ 37-38). The increased order for 14 loads was also noted on the two additional Contract Confirmations that Warner provided to Patricio Assis in April 2007 and June 2007. (Id. at ¶ 42). Patricio Assis forwarded the June 2007 Contract Confirmation to his sister in Brazil shortly after receiving it and forwarded the

-3-

document again in November 2007. Each time, he referred to the document as "the Schutzman contract," in Portuguese. (Id. at ¶ 44).

The parties proceeded under the contract and Nutsco delivered ten loads of SLW-1 cashews to Schutzman, with the last load being received on November 9, 2007. (DRPFOF ¶¶ 69-70). After receiving the tenth load, however, Schutzman roast tested the cashews and determined that they did not qualify as "first quality" under Association of Food Industries, Inc.'s (AFI) specifications because of a high level of scorching. (Id. at ¶¶ 72-74). AFI specifications spell out how large cashew kernels must be to qualify as "super large whole" (SLW) or "large whole" (LW) and what amount of defect or damage they can have to still qualify as "first quality." (Id. at ¶¶ 16-18; PRDFOF ¶ 142). Nutsco represents to the market that if they are going to sell SLW-1 cashews, the cashews will meet AFI standards for SLW-1's. (DRPFOF. at ¶ 20).

After determining that the tenth load did not meet standards, Schutzman notified Warner that the load was highly scorched and Jim Warner brought the complaint and results of the roast test to Patricio Assis's attention. (DRPFOF ¶ 89, 91). At Warner's request, Schutzman provided six cases of cashews from the tenth load for evaluation by Nutsco. (Id. at ¶¶ 92-93). Nutsco did not perform a roast test of the samples, but did conclude after its own analysis that the raw cashews themselves did not meet AFI Specifications for first quality cashews. (Id. at ¶ 95).

-4-

Two months after Nutsco delivered the tenth load, in January 2008, Patricio Assis began arguing that the parties' contract only provided for 12 loads of SLW-1 cashews and that Nutsco was not responsible for providing the two additional loads added in March 2007. (DRPFOF ¶ 99). At this point in time, the market prices for SLW-1 cashews were approximately $2 per pound higher than the price Nutsco was to receive from Schutzman under their contract. (Id.). Warner reported to Schutzman that Mr. Assis was arguing that the parties did not have a signed contract covering the additional loads. (Id. at ¶ 100).

Warner acknowledged that Schutzman was within its rights in rejecting the tenth load, but tried to persuade Schutzman to accept the load instead. (DRPFOF ¶ 104). Schutzman initially agreed to keep the load and pay the contract price, on the condition that Nutsco deliver all remaining loads, including loads 13 and 14. (Id. at ¶ 105). Patricio Assis would not agree to this arrangement. (Id. at 107). Warner then attempted to circumvent Patricio Assis and contacted Francisco Assis Neto directly. (Id.). Jim Warner advised Mr. Neto in an email that Schutzman would pay for the scorched tenth load, but wanted delivery of the five loads of cashews remaining under the contract. (Id.). The communication also stated that the parties would await a reply and not take any action until they received a response. (Id.). While waiting for a reply, Schutzman stored the tenth load in its refrigerated warehouse. (Id. at ¶ 108).

Case 2:08-cv-00465-JPS   Filed 12/16/09   Page 5 of 24   Document 56

Schutzman never received a response on the matter and turned the issue over to its legal counsel, setting in motion the instant litigation. (DRPFOF ¶ 110). On May 5, 2008, Jim Warner sent an email to Patricio Assis reminding him that Schutzman was waiting for Nutsco to pick up the rejected tenth load of cashews and advising him to contact Mike Kloth in Schutzman's shipping department. (Id. at 111). Mr. Assis did not contact Mr. Kloth regarding pick up until one month later, on June 5, 2008. (Id. at 112). Due to confusion with Schutzman's new buyer, Mr. Kloth wrongly informed Mr. Assis that Schutzman did not possess a load of SLW-1 cashews waiting to be picked up by Nutsco. (Id. at ¶¶ 113-114). The issue was cleared up the following month during a July 25, 2008, scheduling conference between the parties' attorneys. At this meeting, Nutsco's counsel informed Schutzman that Nutsco had received conflicting messages about the tenth load. (Id. at ¶ 115). Schutzman clarified that it did possess the load of cashews and Nutsco made arrangements to retrieve it from the warehouse. However, Patricio Assis insisted on first personally inspecting the load. (Id. at ¶ 116). Another month passed before Mr. Assis traveled to Wisconsin to conduct his inspection. Mr. Assis finally inspected the load on September 3, 2008, and arranged to have the load picked up on September 10, 2008. (Id. at ¶ 118.).

Schutzman did not pay for the rejected tenth load of SLW-1 cashews that Nutsco retrieved in September 2008. (DRPFOF ¶ 124). Schutzman did pay all invoices for the nine preceding loads it received and accepted. (Id. at ¶ 125).

Schutzman paid a reduced price on two of the invoices after Warner agreed that it could apply $1,750 and $1,284 in credit against these invoices. (DRPFOF ¶ 125).

In addition to the amounts it paid to Nutsco for delivery of the nine accepted loads, Schutzman also paid to purchase loads of SLW-1 cashews from other wholesalers. (DRPFOF ¶ 121). Schutzman purchased five loads to replace the remaining loads it had expected Nutsco to provide under their contract. (Id. at ¶ 120). Schutzman paid $5.45 per pound for these loads and received delivery between June 18, 2008 and September 12, 2008. (Id. at ¶¶ 121-22). Schutzman paid $367,850 more for the five loads than it would have paid under the contract with Nutsco. (Id. at ¶ 123). This amount forms the basis for Schutzman's claim of damages.

## ANALYSIS

Schutzman asserts that it is entitled to summary judgment on its breach of contract claims and on Nutsco's six counterclaims. A grant of summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). The party opposing summary judgment cannot simply rest on allegations or denials in its pleadings, but

-7-

Case 2:08-cv-00465-JPS   Filed 12/16/09   Page 7 of 24   Document 56

rather, it must also introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial. *Anders v. Waste Management of Wisconsin*, 463 F.3d 670, 675 (7th Cir. 2006). The court views all facts and draws all reasonable inferences in favor of the nonmoving party. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006).

**1.     Schutzman's Breach of Contract Claim**

Schutzman asserts that it contracted with Nutsco for the purchase of 14 loads of SLW-1 cashews and that Nutsco breached this contract by providing only nine loads. Nutsco acknowledges that it never provided the full number of loads required by the contract. However, Nutsco asserts that it was only obligated to provide the number of SLW-1 cashew loads included in the original contract between the parties because it never authorized an amendment to the contract. Nutsco also argues that Schutzman is not entitled to damages for the tenth load, which was later returned to Nutsco, because Schutzman wrongly rejected the load as being out of specification. Finally, Nutsco argues that Schutzman is not entitled to damages for the undelivered loads because Schutzman committed an earlier material breach of the contract. Nutsco alleges that Schutzman committed conversion of the tenth load of cashews by refusing to return it until September 2008.

**a.     Number of Loads Under the Contract**

The parties agree that Nutsco did not deliver the full number of loads promised under their contract. The parties disagree, however, about the total number of loads

Case 2:08-cv-00465-JPS   Filed 12/16/09   Page 8 of 24   Document 56

required by that contract. Schutzman asserts that the contract provided for the sale of 14 loads of SLW-1 cashews, while Nutsco argues that it only provided for the sale of 12 loads. Schutzman maintains that Nutsco's broker, Jim Warner, amended the contract in March 2007 to include an additional two loads and that Nutsco confirmed this amendment by failing to object after receiving multiple copies of the revised contract. Conversely, Nutsco argues that it was only obliged to provide the 12 loads specified in the original contract because Jim Warner did not have authority to amend the contract and obligate Nutsco to provide an additional two loads.

Nutsco does not contest that Warner amended the contract between Schutzman and Nutsco to include an additional two loads. Nutsco merely contests that Warner had either the actual or apparent authority to do so. However, Nutsco fails to establish a genuine issue of material fact regarding Warner's authority. Therefore, the revised contract was enforceable and obligated Nutsco to provide 14 loads of SLW-1 cashews.

Schutzman asserts that Warner had actual authority to amend the contract based on Jim Warner's testimony. Schutzman points to Mr. Warner's affidavit testimony stating that Patricio Assis authorized him to make two additional loads available to Schutzman and Mr. Warner's deposition testimony stating that Patricio Assis was happy with the increased order and never informed him that Nutsco objected to an amendment of the contract. Schutzman also notes that Patricio Assis testified that he was "not sure" whether he gave authorization to Warner to amend

the contract. Nutsco does not directly refute these statements. Instead, Nutsco responds that "no documents or information exist" establishing that Warner had the authority to commit Nutsco to providing an additional two loads of SLW-1 cashews. However, this does not create a genuine issue of material fact.

Nutsco also tries to create a genuine issue of fact by arguing that a factfinder could infer from the contract itself that Warner did not possess the authority to amend it. First, Nutsco argues that the inclusion of a buyer's option for LW-1 cashews shows that Warner did not have actual authority to amend. If Warner could simply amend the contract, Nutsco urges, then providing Schutzman with an "option" for the purchase of additional LW-1's within the contract is unnecessary. Second, Nutsco argues the fact that the parties executed other contracts prior to the contract at issue in this case showing that Warner did not have blanket authority to amend contracts. Nutsco reasons that if Jim Warner had amendment authority, he would have simply added loads to prior contracts and there would be no need to enter into additional, separate contracts. These arguments are unconvincing. The inclusion of a buyer's option to purchase LW-1 cashews does not explicitly foreclose amendment of the contract to add loads of SLW-1 cashews. Further, the existence of prior, completed contracts is irrelevant. Businesses who engage in ongoing sales relationships need not do so under only one contract. There are no larger implications arising from Nutsco and Schutzman's decision to execute one contract for a particular number of sales and deliveries, and, when that set of sales was

complete, to execute a second contract for a new set of sales and deliveries. A reasonable fact finder could not determine that Jim Warner did not have authority to add two loads of SLW-1 cashews to a particular contract based solely on the fact that Nutsco and Schutzman had previously executed other contracts.

Regardless, Warner had apparent authority to amend the contract. A principal may be held liable for the acts of another when the principal had knowledge of those acts and acquiesced in them, causing a third person to reasonably believe that authorized agency existed. *Lamoreux v. Oreck*, 2004 WI App 160, ¶ 52, 275 Wis.2d 801, 686 N.W.2d 722; *See also Sickinger v. Raymond*, 178 Wis. 439, 446, 190 N.W. 93, 95 (1922) ("It is the well-settled rule that, if a principal so conducts his business as to lead the public to believe that his agent has authority to contract in the name of the principal, he is bound by the acts of such agent within the scope of his apparent authority as to contracts with persons who, acting in good faith, believe, and have reasonable ground to believe, that the agent has such authority."). The elements necessary for apparent authority include: 1) acts by the principal or agent giving a third party a justifiable belief that agency exists; 2) the principal's knowledge of the acts; and 3) reliance on the acts by the third party. *Iowa National Mutual Insurance Co. v. Backens*, 51 Wis.2d 26, 34, 186 N.W.2d 196, 199-200 (1971).[1]

---

[1]The parties both assume that Wisconsin law applies to their contract and provide no evidence of a choice of law clause stating otherwise. Schutzman is based in Wisconsin and delivery of the cashews that are the subject of the suit also occurred within this state. Thus, the court will apply Wisconsin law. *State Farm Mutual Auto Insurance Co. v. Gillette*, 2002 WI 31, ¶ 51, 251 Wis. 2d 561, 641 N.W.2d 662 (holding that courts should assume that Wisconsin law applies unless non-forum contacts are clearly more significant).

-11-

Schutzman presents evidence establishing these elements. First, Schutzman justifiably believed that Warner had authority to agree to the sale of two additional loads. Nearly all of Schutzman's communications and dealings with Nutsco regarding the original contract went directly through Warner and Nutsco held Jim Warner out as its "salesperson." Schutzman negotiated and finalized its original agreement through Warner and received its Contract Confirmation from Warner. When Schutzman sought to amend that contract, it again went through Warner and did not contact Nutsco. Schutzman negotiated for the addition of two loads and then, just as with the original contract, received a copy of the revised Contract Confirmation from Warner. Schutzman's previous experience negotiating a contract through Warner and its receipt of a revised contract from Warner incorporating its requested amendment led Schutzman to reasonably believe in Warner's authority.

Second, Nutsco was aware of the amendment Warner made to the contract. Indeed, Nutsco received three contract confirmations that provided for the sale of increased load numbers and increased cashew weights. One of the revised contract confirmations even included a note specifying that "two loads were added on 3/2/07." Despite receiving the revised Contract Confirmations in March, April and June 2007, Nutsco did not attempt to correct any alleged errors or inform either Warner or Schutzman that the amendment was not authorized. Instead, it appeared to acquiesce to the change. As late as November 2007, Nutsco forwarded the revised

-12-

Contract Confirmation to Brazil and referred to it as "the Schutzman contract." There is no question that Nutsco had knowledge of Warner's amendment of its contract.

Finally, Schutzman has always maintained that it believed Warner's representations that Nutsco would provide it with 14 loads of SLW-1 cashews, and Nutsco does not dispute this fact. Schutzman had no reason to believe otherwise, as it did not receive any word from Nutsco that the two additional loads were unauthorized until January 2008. It was only after Nutsco denied any obligation to provide a thirteenth and fourteenth load that Nutsco purchased loads of cashews from other wholesalers.

Warner had apparent authority to amend the contract and add two additional loads. Therefore, the contract between the parties provided for the sale and delivery of 14 loads of SLW-1 cashews. The court will employ this figure as the contractually required number of loads for the remainder of its analysis.

**b.    Condition of the Tenth Load**

Schutzman seeks an award of damages for "cover" expenses it incurred in replacing a load of cashews delivered by Nutsco, but ultimately rejected and returned for not meeting AFI specifications. Nutsco denies that Schutzman is entitled to damages for this "tenth load" because Schutzman does not have a legitimate basis for rejecting the load. Nutsco argues that the AFI specifications for scorching did not apply to its cashews because its contract did not provide for roast testing. Nutsco cites language from the AFI specifications stating that "[i]f a roast

-13-

test is required in the contract, it should be conducted in accordance with Appendix II." (Def.'s Opp. Br. at 12). Nutsco takes this phrase to mean that its cashews did not need to meet AFI specifications and Schutzman wrongly rejected the load for failing to meet the inapplicable specifications.

However, the cited language states only that a contractually-required roast test must be conducted in compliance with AFI specifications. It says nothing about the applicability of AFI specifications in the absence of a contract provision for roast testing. Here, the parties understood the AFI specifications to apply.

Indeed, Nutsco fails to account for Patricio Assis's statement that the cashews provided to Schutzman were supposed to meet AFI specifications. Mr. Assis testified that when Nutsco sells SLW-1 cashews, Nutsco is representing that those cashews will meet all AFI specifications for SLW-1 cashews. Even if the cashews did not have to meet AFI specifications for roast cashews, the tenth load failed to meet AFI specifications for raw cashews. Nutsco concedes that it analyzed the raw cashews and confirmed that they did not meet the AFI specifications. Therefore, the parties understood the contract for SLW-1 cashews to mean that the cashews would meet AFI specifications, which the tenth load failed to do. Nutsco fails to establish an issue of material fact as to whether the SLW-1 cashews must comply with AFI specifications under the contract.

### c.    Conversion of the Tenth Load

Schutzman argues that it is entitled to summary judgment based on Nutsco's failure to provide promised loads 10 through 14.  However, Nutsco argues that Schutzman materially breached the contract by committing the tort of conversion, excusing Nutsco from its contractual obligations to provide the remaining loads. Nutsco asserts that Schutzman converted the tenth load of cashews by holding it for more than eight months.  Conversion is the only basis Nutsco asserts as a material breach of the contract.  Thus, if Schutzman did not convert the load, then there is no material breach which might justify nonperformance.

Conversion is the wrongful exercise of dominion or control over chattel and is usually committed through an unauthorized transfer of the goods to someone not entitled to them. *Production Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*, 82 Wis. 2d 5, 10, 261 N.W.2d 127, 129 (1978).  The elements of a conversion claim include: 1) intentional control or taking of property belonging to another, 2) without the owner's consent, 3) resulting in serious interference with the owner's right to possess the property. *H.A. Friend & Co. v. Professional Stationery, Inc.*, 2006 WI App 141, ¶ 11, 294 Wis. 2d 754, ¶ 11, 720 N.W.2d 96, ¶ 11; *see also Bruner v. Heritage Companies*, 225 Wis.2d 728, 736, 593 N.W.2d 814, 818 (Ct. App. 1999).

Nutsco is crippled by a lack of evidence regarding conversion of the tenth load.  To support its claims, Nutsco relies entirely upon an email sent by its broker

and upon the length of time between Nutsco's delivery of the tenth load and Nutsco's retrieval of the rejected load. However, the fact that *Nutsco's* broker advised Schutzman: "I suggest you keep the container you have as collateral," provides no evidence that Schutzman actually converted the tenth load.

Further, the simple passage of time between the load's November 2007 delivery and September 2008 retrieval by Nutsco does not tell the entire story. First, the tenth load was delivered into Schutzman's possession pursuant to a valid contract. Thus, Schutzman's control over the load was authorized. Even after Schutzman initially complained about the condition of the load, the parties were negotiating for Schutzman's acceptance of the load. Indeed, Nutsco's broker convinced Schutzman to accept the out-of-spec load. As of January 2008, Warner and Schutzman had arranged that Schutzman would accept the tenth load on the condition that Nutsco deliver the remaining loads required under the contract. However, Schutzman never received confirmation that Nutsco would deliver the remaining loads if Schutzman accepted the tenth load and Schutzman pursued legal action. It was only at this point that Schutzman ultimately rejected the load of cashews, and it became clear that Schutzman's possession of the load was not considered a part of the contract.

Nutsco then received word that Schutzman was waiting for the rejected tenth load of cashews to be picked up. Warner sent Patricio Assis an email on May 5, 2008, reminding him of this fact. Nutsco then delayed for a month before contacting

-16-

Schutzman's shipping department in June 2008. When Nutsco did contact Schutzman, a Schutzman employee incorrectly informed Nutsco that there was no load of cashews waiting for retrieval. However, this was a misunderstanding that was cleared up the following month during a July 2008 attorney scheduling conference. From this point on, any barriers to Nutsco re-gaining possession of the tenth load were constructed by Nutsco itself. Mr. Assis requested a personal inspection of the load before Nutsco would retrieve it, but did not travel to Wisconsin and conduct his inspection until September 2008.

The period of time between Nutsco's delivery of the tenth load and its pick up of that load is insufficient to establish conversion. Nutsco willingly provided the tenth load as part of its contract with Schutzman and the load remained an assumed part of the transaction until Schutzman made the final decision to reject it. Schutzman did not exercise unauthorized control. Nutsco suggests that it began making demands for the return of its load in February 2008, rendering any subsequent possession of the load a conversion. However, the portion of Patricio Assis's affidavit cited in support of this proposition merely states:

> In February 2008, I contacted A.L. Schutzman's accounts payable department regarding the tenth load. Approximately one week later, I again contacted A.L. Schutzman's accounts payable department regarding the tenth load. On both occasions, I was informed that A.L. Schutzman did not have the tenth load.

(Assis Aff. ¶ 19). The affidavit testimony does not state that Nutsco demanded the return of the tenth load. Further, Schutzman had an agreement with Nutsco's broker

-17-

that Schutzman would keep and pay for the tenth load if Nutsco would deliver the remaining contract loads.

Therefore, the only evidence supporting conversion is the misinformation supplied by Schutzman's shipping department employee and Schutzman's control of the load between the time that conversation occurred in June and the time that Nutsco was informed in July that Schutzman did, in fact, have the load in its possession. However, this scintilla of evidence does not raise a genuine issue of material doubt as to whether Schutzman exerted wrongful control over the cashews, without Nutsco's consent, and seriously interfered with Nutsco's right to possess the property. Nutsco regained its SLW-1 cashews and had the opportunity to sell them to another purchaser.

The court holds that conversion did not occur. Nutsco argued that Schutzman's conversion constituted a material breach and excused Nutsco's nonperformance. However, Schutzman did not convert the tenth load. As a result, no material breach occurred and Nutsco's failure to deliver the five remaining loads required under the contract is not excused on this basis.

## 2. Nutsco's Counterclaims

Schutzman also moves for summary judgment on each of Nutsco's six counterclaims, including: 1) breach of contract for failure to satisfy conditions; 2) unjust enrichment; 3) breach of contract for late payment; 4) breach of contract for failure to submit payment; 5) conversion; and 6) breach of duty to act in good faith.

-18-

Nutsco wholly abandons the first four of its six claims and makes no response to Schutzman's summary judgment arguments. Instead, Nutsco defends only its last two claims for conversion and breach of duty to act in good faith. The court will grant summary judgment to Schutzman on all counterclaims because Nutsco fails to raise any genuine issue of material fact.

### a. Breach of Contract - Failure to Satisfy Conditions

Nutsco first asserts a claim for breach of contract arising from Schutzman's alleged refusal to pick up two cashew shipments in April 2007. Nutsco alleged damages for storage and inspection costs incurred for these shipments. However, Nutsco does not oppose Schutzman's summary judgment motion on this claim. Nutsco also admits that Schutzman never refused to pick up a load of SLW-1 cashews from Nutsco in 2007. (DRPFOF ¶ 68). Thus, a grant of summary judgment for Schutzman on this claim is appropriate.

### b. Unjust Enrichment

Nutsco next asserts a claim for unjust enrichment arising from Nutsco's payment of inspection and storage fees for shipments of cashews that Schutzman failed to pick up in a timely fashion. Nutsco makes no response to Schutzman's motion for summary judgment on this claim. Additionally, as noted above, Nutsco admits that Schutzman never refused to pick up any load of SLW-1 cashews. The court will grant summary judgment to Schutzman on this claim.

-19-

### c.    Breach of Contract - Late Payment

Nutsco raises another breach of contract claim, but premises the claim upon Schutzman's alleged failure to make timely payments as required by the contract. Nutsco alleges that it is entitled to interest on the late payments. As with its previous two claims, Nutsco fails to defend its claim. Summary judgment is appropriate because Nutsco does not raise any genuine issue of material fact and because Nutsco concedes that the contract does not provide for interest on late payments. (DRPFOF ¶ 25).

### d.    Breach of Contract - Failure to Submit Payment

Nutsco raises a third breach of contract claim arising from Schutzman's alleged refusal to make full payments for particular loads of cashews it received. Specifically, Nutsco asserts that Schutzman wrongfully refused to pay $118,650 for one load of cashews and underpaid for two other shipments by approximately $3,034. Schutzman moves for summary judgment on this claim and cites evidence that it withheld the $118,650 payment on the tenth load of SLW-1 cashews (which was ultimately rejected) because the cashews did not meet AFI specifications. Schutzman also cites evidence that Nutsco agreed to give it $3,034 in credit for accepting two slightly non-conforming loads of LW-1 cashews. Nutsco makes no

response to Schutzman's arguments or cited evidence.[2]  Thus, the court will enter summary judgment in favor of Schutzman on the claim.

     **e.    Conversion**

Nutsco claims that Schutzman converted the tenth load of SLW-1 cashews by holding the load until September 2008.  Nutsco alleges damages arising from its inability to re-sell the load to a different buyer during a time when the market price of $5.00 per pound for such cashews was higher than the contract price of $3.30 per pound because the load was in Schutzman's possession.  However, as previously discussed, Schutzman did not convert the tenth load because there was no wrongful exercise of control.  Further, Nutsco cannot establish that it suffered damages. Nutsco reclaimed possession of the tenth load and could have re-sold the cashews anytime thereafter.   Nutsco presents no evidence that receiving the tenth load in September, rather than five months earlier, caused Nutsco to miss out on the high market prices for cashews.

Instead, the evidence shows that market prices for SLW-1 cashews remained high even after Nutsco picked up the tenth load.   Schutzman paid $5.45 per pound to obtain two loads of cashews from an alternate wholesaler in September 2008, the same period in which Nutsco reclaimed its own load.  Therefore, the market price for SLW-1 cashews remained higher than the contract price Nutsco would have

_____

[2]The court notes that Nutsco previously attempted to abandon this claim.  On July 10, 2009, Nutsco sought leave to file an amended counterclaim which eliminated the claim for breach of contract based on failure to submit payment. (*See* Docket ## 37, 38).  However, Nutsco then withdrew its motion to amend  and the original counterclaim remains the operative pleading. (*See* Docket #43).

received if Schutzman accepted the tenth load instead of rejecting it. Nutsco does not show that it was damaged by offering its cashews for sale on the open market in September 2008, instead of at an earlier time in 2008. Finally, the market price cited by Nutsco is irrelevant if it applies to SLW-1 cashews which conform to AFI specifications. The tenth load that Nutsco reclaimed did not meet these specifications. Consequently, Schutzman is entitled to summary judgment on Nutsco's conversion claim.

**f.    Breach of Duty to Act in Good Faith**

Nutsco's final claim alleges that Schutzman violated its duty to act in good faith by engaging in behaviors that gave rise to the previous counterclaims. Nutsco argues that a fact finder could infer that Schutzman breached this duty to act in good faith based on Warner's email suggesting that Schutzman keep the tenth load of cashews as leverage during negotiations and the fact that Nutsco did not pick up the tenth load until September 2008. However, this sparse evidence does not save the counterclaim from summary judgment.

Wisconsin law recognizes an implied contractual duty of good faith and fair dealing. *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 965 (7th Cir. 2000). A party seeking to recover under a breach of the duty of good faith claim must make a showing which can "support a conclusion that the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties." *Zenith Ins. Co. v. Employers Ins. of Wausau*, 141 F.3d 300 (7th Cir. 1998) (citing *Foseid v.*

-22-

*State Bank of Cross Plains*, 197 Wis.2d 772, 541 N.W.2d 203, 212 (Ct. App. 1995)).

However, the evidence Nutsco cites does not show that Schutzman denied it the benefit of their bargain. Nutsco failed on each of its preceding claims and the court found that Schutzman did not materially breach the contract based on conversion. Additionally, the intended benefit for Nutsco under the contract was that it would receive payment for providing loads of cashews to Schutzman. Nutsco did receive payment for all loads that Schutzman accepted. The load of cashews Schutzman rejected was returned to Nutsco. It was Schutzman who was denied the benefit of the bargain because it never received the total number of loads promised in the contract. Therefore, the court will enter judgment in Schutzman's favor on the counterclaim.

## CONCLUSION

Nutsco contracted to provide Schutzman with 14 loads of SLW-1 cashews, but breached the contract by providing only nine. Nutsco's nonperformance is not excused by any material breach on Schutzman's part. Therefore, the court will grant summary judgment in favor of Schutzman on its claim for breach of contract. A grant of summary judgment is also appropriate on each of Nutsco's counterclaims. Nutsco fails to defend four of its six claims, and fails to establish a genuine issue of material fact regarding its claims for conversion and breach of the duty of good faith.

Accordingly,

**IT IS ORDERED** that the plaintiff's motion for summary judgment on its complaint and on the defendant's counterclaims (Docket #30) be and the same is hereby **GRANTED**; and the plaintiff, A.L. Schutzman Company, Inc., shall have and recover from the defendant, Nutsco, Inc, the sum of Three Hundred Sixty-Seven Thousand, Eight Hundred Fifty Dollars ($367,850.00) together with costs as taxed by the Clerk of the Court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 16th day of December, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-24-